IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(ERIE DIVISION)

| | | |
|---|---|---|
| BILL E. COOK, | ) | |
| | ) | Civil Action No. 1:07-cv-00172 |
| Plaintiff, | ) | |
| | ) | Honorable Sean J. McLaughlin |
| v. | ) | |
| | ) | Electronically Filed |
| BROOKS SPORTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM IN SUPPORT OF
DEFENDANT BROOKS SPORTS, INC.'S
MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. STATEMENT OF FACTS ........................................................................................ 3

    A. Bill Cook's Employment with Brooks. ............................................................ 3

    B. Cook's Managers Knew of Cook's Disability When They Hired Him. ................. 4

    C. Significant Changes in the Brooks-Finish Line Partnership Prompted Cook's Lay Off. ............................................................................................... 4

    D. Brooks Accommodated Cook's Disability by Granting Paid Extended Sick Leave, and by Modifying His Job Duties and Schedule. ........................ 5

    E. Cook's Supervisors Continued to Support Him After His Position Was Eliminated. ....................................................................................................... 7

    F. Cook Failed to Mitigate His Alleged Damages. .............................................. 7

III. ARGUMENT & AUTHORITY ................................................................................ 8

    A. There is No Evidence of Disability Discrimination. ....................................... 8

        1. Cook Was Terminated Because of Changes in the Brooks-Finish Line Partnership, Not Because of His Disability. ...................................... 9

        2. Cook Cannot Establish Pretext Because There Is No Evidence that Discriminatory Animus Motivated Brooks' Decision to Terminate Cook. ............................................................................................... 10

    B. There is No Evidence of Retaliation. ............................................................ 11

    C. The Fact That The Same Actors Who Eliminated Mr. Cook's Region Also Engaged In Recent Positive Conduct Towards Him Compellingly Confirms Absence Of Discrimination, Therefore Judgment Must Be Entered as a Matter of Law. .......................................................................... 12

IV. CONCLUSION ....................................................................................................... 13

## I. INTRODUCTION

Plaintiff Bill Cook disclosed that he had rheumatoid arthritis to his soon-to-be supervisor during his initial interview for employment with Brooks Sports, Inc. Those supervisors hired Cook, and accommodated him when he later took leave – indeed, Cook's managers and other Brooks' executives even donated their own paid time off to him while on leave. When Cook's region was closed for business reasons and he was laid off with severance, these same managers tried to help Cook obtain another job. Yet instead of recognizing Brooks' positive, non-discriminatory intent and acts,[1] Bill Cook filed this lawsuit alleging disability discrimination.

Bill Cook has failed to produce any evidence of discrimination. To survive summary judgment, Cook must do more than tick the boxes of a *prima facie* case. This is particularly true where, as here, the same actors that hired, promoted and gave pay increases made the lay-off decision. To overcome this evidence, Cook is required to present sufficient evidence from which a reasonable trier of fact could find that discrimination and/or retaliation occurred in violation of the Americans with Disabilities Act ("ADA"). Yet Cook identifies no evidence in support of his disability discrimination and retaliation claims. Instead, Cook's deposition testimony confirms the following:

- At no point during his employment at Brooks did Cook hear a negative comment related to his or any other person's medical condition. Cook Dep. 60:8-61:9, Exh. G to Droke Decl.

- Brooks' accommodated Cook by modifying his job duties as requested, all the while paying him full salary. Cook Dep. 98:25-99:6; 102:1-104:2; 108:10-

---

[1] At the conclusion of the EEOC inquiry into Cook's termination, the Investigator determined: "The information obtained from company records and interview [sic] of the decision makers supports the company defense that Mr. Cook's employment was terminated because of a change in business conditions. There is insufficient evidence to show that his disability was involved." Declaration of Michael Droke ("Droke Decl."), Exhibit A.

109:20.

- Brooks' facilitated generous donations of leave time from Brooks' management and employees, including Cook's direct supervisors and top Brooks' executives. Cook Dep. 97:8-98:10. The same individuals who donated their own personal leave to Cook made the decision to close his region.

Even after Cook's position was eliminated, his former managers and colleagues went out of their way to help Cook secure a new position at Brooks or elsewhere. In sum, when asked to describe his managers' and colleagues' attitudes toward his medical condition, Cook testified that they offered him "a lot of support" and were "very helpful." Cook Dep. 159:15-19.

The decision to eliminate the Pittsburgh Sole Tech position was not related to Cook personally, let alone his medical condition or hospitalization. Brooks eliminated the Pittsburgh Sole Tech position because of changes in the non-specialty store market between 2004 and 2005. During that period, Finish Line unilaterally decided to cut back the number of stores carrying Brooks' products—decreasing Brooks' projected 2005 revenue approximately $1.5 million dollars. Sheridan Dep. 12:21-13:4; Droke Decl Exh. H. Brooks' simultaneous emerging success with other non-specialty accounts led Brooks to refocus its Sole Tech program on non-Finish Line accounts. Cook was terminated for the legitimate nondiscriminatory reason that market changes eliminated the need for a Sole Tech in the Pittsburgh region, which was predominantly focused on Finish Line business. To date, Brooks has not filled Cook's position. Absent any evidence of pretext or discriminatory intent, Cook's claims alleging discrimination and retaliatory discharge fail as a matter of law, and Brooks is entitled to summary judgment or, alternatively, summary adjudication.[2]

---

[2] While Cook initially asserted a failure to accommodate claim in his Complaint, he has since represented that he does not intend to pursue, and knows of no facts to support, a failure to

## II. STATEMENT OF FACTS

### A. Bill Cook's Employment with Brooks.

Brooks Sports, Inc. is a company based in Bothell, Washington that designs and markets running shoes, athletic apparel and accessories. Bill Cook began working for Brooks in August 2001 as a sales employee. Offer Letter, Droke Decl., Exh. B. He voluntarily disclosed his medical condition in the first interview, and was hired with knowledge of that condition. Cook Dep. 68:21-25, 75:10-22. Cook was one of two employees hired to work exclusively on Brooks' partnership with Finish Line, Inc., an athletic retailer that specializes in brand name footwear, apparel and accessories. Cook Dep. 76:16-77:1-6. He was not an active runner at the time of hire, nor throughout his employment. Cook Dep. 68:14-20, 69:11-17.

Cook worked as a "Sole Tech," which meant that he acted as a sales liaison between Brooks and Finish Line stores. The position required him to regularly visit the Finish Line stores in the markets over which he was responsible. Cook Dep. 77:8-16; 79:20-23. Once in the store, Cook interacted directly with customers by recommending and selling Brooks' products. *Id.*; Job Description, Droke Decl., Exh. J. He also conducted training programs for Finish Line employees, leading after-hours clinics during which he would inform store personnel about Brooks' products, how to fit footwear, and general sales techniques. *Id.*

After a 2002 expansion of the Finish Line program, Cook requested and was given a position in the Pittsburgh market, near where his wife's family resided. Cook Dep. 14:8-16; 47:11-48:9. He worked exclusively in the Pittsburgh market from 2002 until the region was eliminated in June 2005.

---

accommodate claim. Cook Dep. 153:10-14; Plaintiff's Answers to Defendant's First Interrogatories, Droke Decl., Exh. I (hereinafter "Plaintiff's Answers") Nos. 8, 9, 15.

### B. Cook's Managers Knew of Cook's Disability When They Hired Him.

Cook's illness bore no weight in Brooks' decision to hire him. Cook was open about his condition with his coworkers and managers from the commencement of his employment with Brooks, even mentioning that he was diagnosed with rheumatoid arthritis at age seven during his initial interview with Brooks in 2001. Cook Dep. 66:7-69:25, 71:14-24, 73:25-76:10.

Cook testified in his deposition that Brooks did not require Sole Techs to be regular runners. Cook Dep. 69:14-25. Cook also testified that at no time during his employment did he ever hear a derogatory or negative comment made in reference to his medical condition or illness. Cook Dep. 60:8-61:9. Cook <u>cannot recall any negative comments about him at all</u>, from either managers or peers, except for constructive criticism contained in Cook's performance reviews that bore no relationship to Cook's medical condition. Cook Dep. 60:25-62:13.

### C. Significant Changes in the Brooks-Finish Line Partnership Prompted Cook's Lay Off.

Finish Line retained the discretion to determine which stores, markets, and locations would carry Brooks' products. Cook Dep. 80:2-18. In mid-2004, Finish Line notified Brooks that it wanted to scale back its partnership with Brooks from 120 to 50 stores. Sheridan Dep. 12:21-13:6. Finish Line represented to Brooks that it would base its store and market selection on the sales performance of Brooks' products in stores across each of the markets. *Id.* Due to these cut-backs, the proportion of Finish Line accounts decreased for all of Brooks' Sole Techs. Sheridan Dep. 13:7-25.

As of August 2004, Brooks' Sole Techs each carried an average of 39.4 total accounts with an average of 14 Finish Line stores. Droke Decl. Exh. C. Cook's region had a disproportionate number of Finish Line accounts as compared to non-Finish Line accounts. Sheridan Dep. 13:7-25; Droke Decl. Exh. C. Overall, Cook had between 17 and 19 accounts in the Pennsylvania market, including 13 Finish Line stores and 4 Dick's Sporting Goods stores.

Droke Decl. Exh. C; *see also* Cook Dep. 86:8-11, 105:23-106:4. By contrast, the five other markets serviced by Sole Techs averaged a total of 18.4 non-Finish Line accounts, or at least four times more – for example, two other regions carried respectively 31 Dick's Sporting accounts and 27 accounts with various other non-specialty retailers. Droke Decl. Exh. C.

When it became clear that Brooks would not need the same number of Sole Techs to cover its diminished Finish Line accounts, Brooks' sales managers turned to the difficult decision of determining which regions to close and, as a result, who to lay off. Cook's region was disproportionately focused on Finish Line—the Pittsburgh market having experienced the least amount of growth with other non-specialty retailers. That region was eliminated, and Cook was laid-off. Sheridan Dep. 12:21-13:4.

Dan Sheridan notified Cook of his termination in person. Sheridan Dep. 13:5-20. Brooks extended Cook's termination date to the beginning of the next month so Cook could participate in another month of company-paid benefits. Cook Dep. 126:20-127:5. In addition to paying all wages and commissions due, Brooks paid Cook six weeks severance pay and a bonus. Cook Dep. 49:18-20; 127:6-24.

Brooks did not replace Cook. Cook Dep. 52:12-25. Since June, 2005, the Pennsylvania market's Finish Line stores have occasionally been handled remotely by a Sole Tech responsible for another region.

> **D. Brooks Accommodated Cook's Disability by Granting Paid Extended Sick Leave, and by Modifying His Job Duties and Schedule.**

In late December 2004, Cook experienced his first flare-up in approximately 10 years. 96:5-15. He was hospitalized for approximately one week on three separate occasions between December 2004 and March 2005. Cook Dep. 100:23-101:10. In addition to missing several weeks of work, Cook was allowed and encouraged to work modified duties on a part-time schedule for several months, but with full pay. Cook Dep. 101:20-25.

5

Cook admits that he received "a lot of support" from managers between January and March 2005. Cook Dep. 159:15-19. Cook testified in his deposition that Brooks was "very helpful" in giving Cook the time off that he needed. Cook Dep. 96:20-23. Cook's colleagues at all levels of the organization—including Cook's direct supervisors, the Chief Executive Officer and Chief Financial Officer—all donated their own accrued sick leave to Cook under Brooks' "Compassionate Sick Leave Program." Cook Dep. 97:8-98:10. Cook used 19 hours of compassionate leave in the pay period ending April 1, 2005, and 64.5 hours in the period ending April 17, 2005. Droke Decl., Exh. D. These donations ensured that Cook was paid his full-time salary between January and March 2005, which included the three weeks when Cook was hospitalized as well as the months during which his condition required that he work part-time. Cook Dep. 98:25-99:6.

When Cook was able to work between January and March 2005, Brooks allowed him to make various modifications to his position. Cook testified he was allowed to "redesign" his job. Cook Dep. 103:17-104:2. Cook's modifications included a part-time schedule of four hours per day, in which he would physically visit one store and contact others by phone and/or e-mail. Cook Dep. 108:10-109:20. Because Cook could not stand for extended periods of time, he sat more during his visits, he stopped conducting informational clinics, and he was able to rely upon a Sole Tech Assistant to do miscellaneous physical tasks in the store, like conducting inventory. Cook Dep. 102:1-104:2. Cook testified that his direct supervisor, Marc Misiewicz, supported each of the modifications to Cook's position, telling Cook to "focus on getting better" when Cook was concerned about the effect of his absence on his stores. Cook Dep. 104:24-105:10.

Because Cook's stores continued to generate income while he worked part-time, Cook received commission-type bonuses for quarter four of 2004, and quarters one and two of 2005.

Droke Decl., Exh. E. His annual performance review dated April 15, 2005 indicates that he met the Company's expectations through the period of his illness. Droke Decl., Exh. F.

> **E.    Cook's Supervisors Continued to Support Him After His Position Was Eliminated.**

After his position was eliminated, Cook continued to receive support from his supervisors and colleagues. In Cook's own words: "pretty much anyone would have been willing to help." Cook Dep. 53:24-54:4. Cook's direct supervisor, Marc Misiewicz, reviewed Cook's resume in August 2005 and sent Cook suggestions to assist in his job search. Cook Dep. 170:23-171:5. Misiewicz also communicated to Cook that he would do what he could to help Cook find a position within the Russell Corporation brand. Cook Dep. 56:21-58:5. John Fendel, U.S. Field Marketing Manager for Brooks, suggested that Cook pursue a marketing position in Boston, Massachusetts, and an apparel position at Brooks' headquarters in Bothell, Washington, but Cook chose not to pursue either position. Cook Dep. 32:17-34:2, 38:16-40:3. Fendel also sent Cook several e-mails about job opportunities and contacts at Nike, Converse, Adidas and other athletic shoe and apparel companies. Cook Dep. 167:17-168:18. Again, Cook chose not to pursue any of these opportunities. *Id.* In fact, Cook cannot recall applying for any specific comparable position—at Brooks or any other Company—since his termination from Brooks. Cook Dep. 28:24-29:24.

> **F.    Cook Failed to Mitigate His Alleged Damages.**

In addition to his severance from Brooks, Cook received unemployment compensation for approximately six months after his separation from Brooks. Cook Dep. 48:21-50:5. In October 2005, Cook began working for Finish Line as a part-time sales person. Cook Dep. 25:25-26:21. Cook quit his job with Finish Line around January 1, 2006 for non-medical reasons, rather to stay home and care for his young children. Cook Dep. 26:22-27:12. In late

2006, Cook qualified for social security benefits due to his medical condition. Cook Dep. 31:20-25.

Cook did not hold another job, nor does he specifically recall applying for another position, until August 2007. At that time, he began working for First Student as a part-time bus driver. Cook Dep. 27:13-25. Cook testified that he does not and cannot work full-time without forfeiting his eligibility for social security. Cook Dep. 31:5-14.

### III. ARGUMENT & AUTHORITY

#### A. There is No Evidence of Disability Discrimination.

Cook alleges that by terminating him Brooks violated the ADA, which prohibits discrimination against a qualified individual with a disability <u>because of</u> the disability. 42 U.S.C. § 12112. To establish a *prima facie* case of intentional disability discrimination, Cook must show that he: (1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) has suffered an adverse employment action **because of** that disability. *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (emphasis added); *see also Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998) (en banc). Under the *McDonnell Douglas* burden-shifting framework, if Cook succeeds in establishing his *prima facie* case, the burden shifts to Brooks to articulate some legitimate, nondiscriminatory reason for the employee's termination. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). Once Brooks articulates a legitimate nondiscriminatory reason, Cook must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.* The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.* at 501.

### 1. Cook Was Terminated Because of Changes in the Brooks-Finish Line Partnership, Not Because of His Disability.

Brooks will concede for the purpose of this motion that Cook has a disability, as defined by the ADA, based on his condition of Stills Disease, a form of rheumatoid arthritis. Brooks will also concede that Cook was a qualified individual under the ADA. Yet despite being disabled and qualified, Cook cannot establish a *prima facie* case of disability discrimination because he was not terminated <u>because of</u> his disability. Instead, Cook was terminated because of changes in the Brooks-Finish Line partnership that eliminated the need for his position.

The primary function of a Sole Tech was to act as a liaison between Brooks and retail stores by training store staff about Brooks products and providing daytime in-store support for staff and customers. Cook began servicing Finish Line's Cincinnati, Ohio stores as a Sole Tech in 2001. After a 2002 expansion of Brooks' partnership with Finish Line, Cook was given a position as Sole Tech in the Pittsburgh market. Although Cook's new market included some non-Finish Line Stores, the majority of his market was still Finish Line stores. Cook worked exclusively in the Pittsburgh market from 2002 until his termination in 2005.

At all times Finish Line retained discretion as to the terms and scope of the partnership with Brooks, including the number and location of Finish Line stores which would be serviced by Brooks' Sole Techs. In Spring 2004 Finish Line announced that it would decrease the number of Sole Tech stores from 120 to 50. Due to these cut-backs, the proportion of Finish Line accounts decreased for all of Brooks' Sole Techs. Brooks' revenue from Finish Line stores came in over $1.5 million below that projected for 2005. Cook's market had a disproportionate number of Finish Line stores and was the most effected by the diminished number of Finish Line accounts.

Brooks' legitimate nondiscriminatory reason for Cook's termination is supported by testimony of a key decision-maker, Dan Sheridan, as well as the breakdown of Sole Tech

Accounts in 2004 and 2005. Cook himself testified that the Pittsburgh market was predominantly focused on Finish Line business, and that Brooks was actively seeking new business with other non-Finish Line accounts, namely Dick's Sporting Goods, in 2005. The legitimate and nondiscriminatory nature of Brooks' decision is further supported by the fact that Brooks did not replace Cook, instead choosing to manage the Pittsburgh accounts "remotely."

### 2. Cook Cannot Establish Pretext Because There Is No Evidence that Discriminatory Animus Motivated Brooks' Decision to Terminate Cook.

Even if Cook could establish a *prima facie* case, Brooks is entitled to summary judgment because Cook cannot establish pretext—the third stage of the *McDonnell Douglas* analysis. To survive summary judgment of his discrimination claim, Cook must discredit Brooks' legitimate nondiscriminatory reason for his termination.

> To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.

*Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (internal quotations and emphasis omitted); *see also Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc) ("[t]he question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination"); *Healy v. New York Life Inc. Co.*, 860 F.2d 1209, 1216 (3d Cir. 1988) ("our inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee").

Cook has failed to set forth any evidence showing that Brooks' legitimate nondiscriminatory reason for his termination was pretext for discrimination. Aside from his allegation that he was a qualified person with a disability, Cook merely relies upon conclusory

10

allegations that he "was terminated based upon his disabilities," "retaliated against," and that "Defendant's articulated reason for termination was pretext for disability discrimination and retaliation." Complaint at ¶¶ 17, 18; Plaintiff's Answers Nos. 14 and 16. Conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment. *See Jalil v. Ardel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). Contrary to pretext, even Cook himself testified that his supervisors were empathetic to his condition, gave him their own pay so he could maintain full salary during his leave, allowed him to modify his job at will, and never spoke derogatorily of him. Ultimately, Cook's discrimination claim fails because he cannot discredit Brooks' legitimate nondiscriminatory reason for his termination.

### B. There is No Evidence of Retaliation.

It is unclear whether Plaintiff continues to claim retaliation independent of his discrimination claim. If so, the facts purportedly supporting such a claim are identical to the discrimination claim, and for the same reasons must be dismissed as a matter of law.

Like the discrimination claim, to establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: (1) that he engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Krouse v. Amer. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). The plaintiff's ultimate burden in a retaliation case is to convince the fact finder that retaliatory intent had a "determinative effect" on the employer's decision. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 931-35 (3d Cir. 1997); *Krouse*, 126 F.3d at 501 ("The plaintiff must prove that retaliatory animus played a role in the employer's decision making process and that it had a determinative effect on the outcome of that process").

As set forth above, Brooks had a clear, legitimate, and non-retaliatory reason to eliminate the Sole Tech job in Pittsburgh and, as a result, lay Cook off. Cook cannot rebut this legitimate reason, thus the retaliation claim must be dismissed as a matter of law.

C. **The Fact That The Same Actors Who Eliminated Mr. Cook's Region Also Engaged In Recent Positive Conduct Towards Him Compellingly Confirms Absence Of Discrimination, Therefore Judgment Must Be Entered as a Matter of Law.**

The critical issue in a discrimination case is whether the plaintiff has produced sufficient evidence of discriminatory intent. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 146-49 (2000). To survive summary judgment, Cook must present evidence that creates an inference of unlawful discrimination under the well-known burden shifting analysis established by the U.S. Supreme Court. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Brooks contends that the Plaintiff's burden heightens when the same actor engaged in positive conduct towards the plaintiff yet later terminated. In one of the early cases to consider the same actor inference, the Third Circuit recognized the compelling evidence without explicitly adopting a presumption of non-discrimination. *See Waldron v. SL Indus., Inc.,* 56 F.3d 491, 496 n. 6 (3d Cir. 1995) (in footnote, stating the same-actor inference "is simply evidence like any other and should not be afforded presumptive value"). The compelling weight of more recent appellate authority considering the issue have overwhelmingly found the practical logic convincing.[3] Here, the supervisors who made the legitimate, non-discriminatory decision to

---

[3] As stated by one court:

[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 189-90 (2001), *citing Lowe v. J.B. Hunt Transp., Inc*., 963 F.2d 173, 175 (8th Cir.1992).

close the market were aware of Cook's medical condition, encouraged his personal and medical care, and gave their own paid time off to Cook while on leave. This evidence – either compelling under the Third Circuit's early case, or presumptive under more recent case law across the United States – confirms that no discrimination occurred in the decision to close the Pittsburgh market.

Cook's claims fail because he provides <u>no evidence of discrimination or retaliation</u> that would connect his lay off to his medical condition. Instead, at best his case results from blatant boot-strapping: Cook was terminated while disabled therefore Cook was terminated because he was disabled. For example, the basis for his discrimination claim: "[P]laintiff is substantially limited in one or more activities." Plaintiff's Answers No. 14. The basis for his retaliation claim? "Plaintiff was approved for a medical leave of absence and accommodations during his hospitalization which caused defendant to terminate his employment." Plaintiff's Answers No. 16. The independent facts of Cook's illness and eventual lay off, without specific and substantial evidence to connect them, are woefully insufficient to support a claim of discrimination or retaliation.

## IV. CONCLUSION

Plaintiff's *post hoc, ergo propter hoc* argument is as meritless as the bootstrapping upon which it is based. Plaintiff offers not a shred of evidence to support either discrimination or retaliation. To the contrary, he baldly admits that at no point during his employment at Brooks

---

In *Coghlan v. American Seafoods Company LLC*, 413 F.3d 1090 (9th Cir. 2005), for example, the Court ruled on summary judgment that the plaintiff's evidence of simultaneous removal of two American masters on other ships and replacement with Norwegian-born masters was insufficient to overcome the same-actor inference of nondiscrimination. In that case, the plaintiff's supervisor took favorable employment action one year before the earliest adverse employment decision. *See also Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 271 (9th Cir. 1996) (holding the plaintiff's evidence was insufficient as a matter of law to rebut the strong same-actor inference); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003) (collecting cases).

did Cook hear a negative comment related to his or any other person's medical condition, Cook Dep. 60:8-61:9; that Brooks' accommodated Cook by modifying his job duties as requested, all the while paying him full salary, Cook Dep. 98:25-99:6; 102:1-104:2; 103:17-104:2, 108:10-109:20; and Brooks' facilitated generous donations of leave time from Brooks' management and employees, including Cook's direct supervisors and top Brooks' executives, Cook Dep. 97:8-98:12.

In a sad example of punishing good deeds and a company that treated him well, instead of either retaining his one brief job or attempting to mitigate his damages, this lawsuit follows. But this court does not sit as a super-personnel department to second-guess Brook's difficult – but non-discriminatory – decision of how to respond to its customer's business strategy decision. Instead, the Court is limited to determining whether discrimination (or, if asserted, retaliation) occurred. Emphatically, it did not, and Plaintiff has not met his burden of proof. Consequently, this case must be dismissed as a matter of law.

Date: May 29, 2008

Respectfully submitted,

*/s/ Michael W. Droke*
Michael W. Droke, WA 25972, *Pro Hac Vice*
Jennifer C. Berry, WA 36881, *Pro Hac Vice*
Dorsey & Whitney LLP
1420 5th Avenue, Suite 3400
Seattle, WA 98101
(206) 903-8800
Fax (206) 903-8820
droke.michael@dorsey.com
berry.jennifer@dorsey.com

Robert W. Cameron
Pa. I.D. No. 69059
bcameron@littler.com
Littler Mendelson, P.C.
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222
(412) 201-7635

Attorneys for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of May, 2008, a copy of the foregoing document was filed using the Western District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel of record:

Gregory G. Paul, Esq.
Pierce Law Offices
707 Grant Street
2500 Gulf Tower
Pittsburgh, PA  15219


*/s/ Michelle F. Hall*
**MICHELLE F. HALL**