IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(ERIE DIVISION)

| | | |
|---|---|---|
| BILL E. COOK, | ) | |
| | ) | Civil Action No. 1:07-cv-00172 |
| Plaintiff, | ) | |
| | ) | Honorable Sean J. McLaughlin |
| v. | ) | |
| | ) | Electronically Filed |
| BROOKS SPORTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT
OF DEFENDANT BROOKS SPORTS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Defendant Brooks Sports, Inc. hereby submits the following concise statement of materials facts in support of their motion for summary judgment:

1. Bill Cook began working for Brooks Sports, Inc. in August 2001 as a sales employee. Droke Decl. Exh. A [Offer Letter]; Cook Dep. 35:1-3.

2. Cook worked as a "Sole Tech," which meant that he acted as an sales liaison between Brooks and Finish Line stores. Cook Dep. 77:8-16.

3. The position required him to regularly visit the Finish Line stores in the markets over which he was responsible. Cook Dep. 77:8-16; 79:20-23.

4. Once in the store, Cook interacted directly with customers by recommending and selling Brooks' products. Cook Dep. 77:8-16.

5. Cook also conducted training programs for Finish Line employees, leading after-hours clinics during which he would inform store personnel about Brooks' products, how to fit footwear, and general sales techniques. *Id.*

6. In 2002, Cook requested and was allowed to work in the Pittsburgh market, where his wife's family resided. Cook Dep. 14:8-16; 47:11-48:9.

1

7. At all times during the partnership, Finish Line retained the discretion to determine which stores, markets, and locations would carry Brooks' products. Cook Dep. 80:2-18.

8. In mid-2004, Finish Line notified Brooks that it wanted to scale back its partnership with Brooks from 120 stores to 50 stores. Sheridan Dep. 12:21-13:6.

9. Due to these cut-backs, the proportion of Finish Line accounts decreased for all of Brooks' Sole Techs. Sheridan Dep. 13:7-25.

10. Finish Line's decision to cut back the program had a dramatic effect on Brooks' revenue for 2005. Sheridan Dep. 12:21-13:4.

11. As of August 2004, Brooks' Sole Techs each carried an average of 39.4 total accounts with an average of 19 Finish Line stores. Droke Decl. Exh. B.

12. Cook's region had a disproportionate number of Finish Line accounts as compared to non-Finish Line accounts. Sheridan Dep. 13:7-25, Droke Decl. Exh. C.

13. Cook had between 17 and 19 accounts in the Pennsylvania market, including 13 Finish Line stores and 4 Dick's Sporting Goods stores. Droke Decl. Exh. D; *see also* Cook Dep. 86:8-11, 105:23-106:4.

14. By contrast, the five other markets serviced by Sole Techs averaged a total of 18.4 non-Finish Line accounts, or at least four times more – for example, two other regions carried respectively 31 Dick's Sporting accounts 31 accounts with various other non-specialty retailers. Droke Decl. Exh. E.

15. Brooks decided to terminate Cook because his region was disproportionately focused on Finish Line—the Pittsburgh market having experienced the least amount of growth with other non-specialty retailers. Sheridan Dep. 12:21-13:4.

16. So that Cook could participate in another month of non-COBRA benefits, Brooks extended his termination date to July 1, 2005. Cook Dep. 126:20-127:5.

17. In addition to paying all wages and commissions due, Brooks paid Cook six weeks severance pay and a bonus. Cook Dep. 49:18-20; 127:6-24.

18. Brooks did not replace Cook. Cook Dep. 52:12-25.

19. Cook bases his discrimination claim entirely on the fact that he has Still's Disease—a type of rheumatoid arthritis that causes him to experience joint pain and fevers. Cook Dep. 54:22-24; 90:15-91:7.

20. Aside from the sole fact of his illness, Cook identifies no other evidence in support of his disability discrimination claim. Plaintiff's Answers to Defendant's First Interrogatories No. 14.

21. Aside from the fact of his illness and the timing of his termination, Cook similarly makes no other allegation in support of his retaliation claim. *Id*.

22. While Cook initially asserted a failure to accommodate claim in his Complaint, he has since represented that he does not intend to pursue, and knows of no facts to support, a failure to accommodate claim. Cook Dep. 153:10-14; Plaintiff's Answers to Defendant's First Interrogatories Nos. 8, 9, 15.

23. Cook was open about his condition with his coworkers and managers from the commencement of his employment with Brooks, even mentioning that he was diagnosed with rheumatoid arthritis at age seven during his initial interview with Brooks in 2001. Cook Dep. 66:7-69:25, 71:14-24, 73:25-76:10.

24. Brooks did not require Sole Tech's to be regular runners. Cook Dep. 69:14-25.

25. At no time during his employment did Cook ever hear a derogatory or negative comment made in reference to his medical condition or illness. Cook Dep. 60:8-61:9.

26. Cook cannot recall any negative comments about him at all, from either managers or peers, except for constructive criticism contained in Cook's performance reviews that bore no relationship to Cook's medical condition. Cook Dep. 60:25-62:13.

27. In late December 2004, Cook experienced his first flare-up in approximately 10 years. Cook Dep. 96:5-15.

28. Cook was hospitalized for approximately one week on three separate occasions between December 2004 and March 2005. Cook Dep. 100:23-101:10.

29. In addition to missing several weeks of work, Cook's relapse also necessitated that he work part-time for several months. Cook Dep. 101:20-25.

30. Cook received "a lot of support" from managers between January and March 2005. Cook Dep. 159:15-19.

31. Brooks and its employees were "very helpful" in giving Cook the time off that he needed. Cook Dep. 96:20-23.

32. Cook's colleagues at all levels of the organization—including Cook's direct supervisors, the Chief Executive Officer and Chief Financial Officer—all donated accrued sick leave to Cook under Brooks' "Compassionate Sick Leave Program." Cook Dep. 97:8-98:10.

33. These donations ensured that Cook was paid his full-time salary between January and March 2005, which included the three weeks when Cook was hospitalized as well as the months during which his condition required that he work part-time. Cook Dep. 98:25-99:6.

34. When Cook was able to work between January and March 2005, Brooks allowed him to make various modifications to his position; in his own words, Cook was allowed to "redesign" his job. Cook Dep. 103:17-104:2.

35. Cook's modifications included a part-time schedule of four hours per day, in which he would physically visit one store and contact others by phone and/or e-mail. Cook Dep. 108:10-109:20.

36. Because Cook could not stand for extended periods of time, he sat more during his visits, he stopped conducting informational clinics, and he was able to rely upon a Sole Tech Assistant to do miscellaneous physical tasks in the store, like conducting inventory. Cook Dep. 102:1-104:2.

37. Cook's direct supervisor, Marc Misiewicz, supported each of the modifications to Cook's position, telling Cook to "focus on getting better" when Cook was concerned about the effect of his absence on his stores. Cook Dep. 104:24-105:10.

38. After his position was eliminated, Cook continued to receive support from his colleagues and managers; in Cook's own words: "pretty much anyone would have been willing to help." Cook Dep. 53:24-54:4.

39. John Fendel, U.S. Field Marketing Manager for Brooks, suggested that Cook pursue a marketing position in Boston, Massachusetts, and an apparel position at Brooks' headquarters in Bothell, Washington, but Cook chose not to pursue either position. Cook Dep. 32:17-34:2, 38:16-40:3.

40. Fendel also sent Cook several e-mails about job opportunities and contacts at Nike, Converse, Adidas and other athletic shoe and apparel companies. Cook Dep. 167:17-168:18.

41. Again, Cook chose not to pursue any of these opportunities. *Id.*

42. Cook's direct supervisor, Marc Misiewicz, reviewed Cook's resume in August 2005 and sent Cook suggestions to assist in his job search. Cook Dep. 170:23-171:5.

43. Misiewicz also communicated to Cook that he would do what he could to help Cook find a position within the Russell Corporation brand. Cook Dep. 56:21-58:5.

44. Despite this support from his former managers and colleagues, Cook cannot recall applying for any specific comparable position, at Brooks or any other Company, since his termination from Brooks. Cook Dep. 28:24-29:24.

45. In addition to his severance from Brooks, Cook received unemployment compensation for approximately six months after his separation from Brooks. Cook Dep. 48:21-50:5.

46. In October 2005, Cook began working for Finish Line as a part-time sales person. Cook Dep. 25:25-26:21.

47. Cook quit his job with Finish Line around January 1, 2006 to stay home and care for his young children. Cook Dep. 26:22-27:12.

48. In late 2006, Cook qualified for social security benefits due to his medical condition. Cook Dep. 31:20-25.

49. He did not hold another job, nor does he specifically recall applying for another position, until August 2007, when he began working for First Student as a part-time bus driver. Cook Dep. 27:13-25.

50. Cook testified that he cannot work full-time without forfeiting his eligibility for social security. Cook Dep. 31:5-14.

51. Cook cannot recall applying for any specific positions at all aside from the part-time sales job with Finish Line, and Cook's current position as a part-time bus driver for First Student in Erie, Pennsylvania. Cook Dep. 29:18-24.

Date: May 29, 2008                    Respectfully submitted,


                                      */s/ Michael W. Droke*
                                      Michael W. Droke, WA 25972, *Pro Hac Vice*
                                      Jennifer C. Berry, WA 36881, *Pro Hac Vice*
                                      Dorsey & Whitney LLP
                                      1420 5th Avenue, Suite 3400
                                      Seattle, WA 98101
                                      (206) 903-8800
                                      Fax (206) 903-8820
                                      droke.michael@dorsey.com
                                      berry.jennifer@dorsey.com

                                      Robert W. Cameron
                                      Pa. I.D. No. 69059
                                      bcameron@littler.com
                                      Littler Mendelson, P.C.
                                      625 Liberty Avenue, 26th Floor
                                      Pittsburgh, PA 15222
                                      (412) 201-7635


                                      Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of May, 2008, a copy of the foregoing document was filed using the Western District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel of record:

Gregory G. Paul, Esq.
Pierce Law Offices
707 Grant Street
2500 Gulf Tower
Pittsburgh, PA  15219


*/s/  Michelle F. Hall*
**MICHELLE F. HALL**