IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(Erie Division)

BILL E. COOK,

    Plaintiff,

vs.                          Civil Action No.: 07-172 E

BROOKS SPORTS, Inc.,

    Defendant.

## **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

AND NOW, comes the Plaintiff, Bill E. Cook, by and through his undersigned counsel, Robert Peirce & Associates and Gregory G. Paul, Esquire, and submits the following Brief in Opposition to Defendant's Motion for Summary Judgment. Plaintiff moves forward on the disability discrimination claim only and concedes on his retaliation claim.

### I. STATEMENT OF THE CASE

This is an action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq*. The facts of the case, as set forth in the Complaint and subsequent pleadings, are as follows.

Bill Cook was hired by Brooks Sports, Inc. in August 2001 to work as a "Sole Tech" in the Cincinnati, Ohio area. At the time of Mr. Cook's initial interview, he informed Brooks that he had been diagnosed with rheumatoid arthritis at age seven, and his interest in running was piqued afterward when he entered remission. Mr. Cook, along with John Fendel in the Indianapolis area, developed the new Sole Tech program. Sole Techs went to Finish Line stores,

1

helped sell Brooks product in these stores, and trained store employees on products and sales techniques by offering informational clinics.

In 2002, Brooks decided to develop the Sole Tech program in the Pittsburgh market. As the Cincinnati market was successful, Mr. Cook requested the transfer as he wanted to conquer new territory, further his career and try to build a new market. Mr. Cook transferred to Pittsburgh in September of 2002. Scott Waltner was hired as the Sole Tech for the Cincinnati territory and was trained by Mr. Cook. Eventually, two other territories were added in the Carolinas and Florida. Mike Hillebrand was hired as the Sole Tech for the Florida market and Brian Leonard was hired as the Sole Tech for the Carolinas. At some point, Leonard left the company and Matt Weber became the Sole Tech for the Carolinas.

In late December of 2004, Mr. Cook had the first flare-up of his rheumatoid arthritis in approximately ten years. He was hospitalized three times between December 2004 and March of 2005, during which time he missed several weeks of work, but continued to call on his stores via email and telephone calls. He worked part-time for several months after his hospitalizations, until he returned to work full-time in May of 2005.

In early 2005, Mr. Cook was diagnosed with Still's Disease, which is a form of rheumatoid arthritis.

Defendants allege that between March and April of 2005, Brooks was informed by Finish Line of its intention to reduce the number of stores that carried the Brooks product in the Pittsburgh area and in the other territories.

During the time of Mr. Cook's hospitalizations, several Ohio stores were added to the Sole Tech program. Mr. Cook requested that he be assigned these stores in the Pittsburgh territory. He already had one store in St. Clairsville, Ohio included in his territory. Despite the

stores being closer to the Pittsburgh territory, they were assigned to Scott Waltner in Cincinnati. Additionally, during the time of Mr. Cook's hospitalization, Mike Hillebrand changed positions in the company and moved to Baltimore. This left the Sole Tech position open in Florida, and a new employee, Carson Caprera was hired to fill this position. Mr. Cook was not offered nor was even aware of either the Baltimore or the Florida job openings. Also during this time, stores were added around Buffalo. Mr. Cook again requested these stores be assigned to the Pittsburgh territory, however, they were given to Hillebrand in Baltimore.

While Mr. Cook was either hospitalized or working part-time due to his medical issues, he continued to meet his goals and in fact his sales surpassed those of other territories.

Mr. Cook was notified of his termination in June of 2005. The reason given for his termination was a reduction in the Pittsburgh market. However, the number of stores in the Pittsburgh market did not change subsequent to his termination. No other Sole Tech positions were eliminated.

## II.  STANDARD OF REVIEW

The standard of review for a summary judgment motion is well-known to this Court. Defendants are entitled to summary judgment only if, after drawing all reasonable inferences in favor of Mr. Cook, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing the Defendant's motion, this Honorable Court must consider all of the evidence in the light most favorable to Mr. Cook. *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949 (3rd Cir. 1990); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden is on the Defendant to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer*

*Gifts, Inc.*, 814 F.2d 893, 896 (3rd Cir. 1987). This Court has jurisdiction over this action pursuant to 29 U.S.C. §§ 1331 and 1343.

## III. ARGUMENT

The American with Disabilities Act of 1990 was enacted in an effort to prevent otherwise qualified individuals with a disability from being discriminated against in employment because of the disability. *See* 29 C.F.R. § 1630. A plaintiff makes out a prima facie case of disability discrimination if he establishes: 1) he has a disability; 2) he is a "qualified individual" and 3) he suffered an adverse employment action because of that disability. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604 (3rd Cir. 2006)(citing *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3rd Cir. 2002); *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3rd Cir. 1998). Recognizing that direct evidence of discrimination is rare, the United States Supreme Court in *McDonnell Douglas Corp. v. Green* established shifting burdens of proof. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once the plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Shaner v. Synthes (USA)*, 204 F.3d 494 (3rd Cir. 2000)(citing *McDonnell Dogulas*, 411 U.S. at 802, 93 S.Ct. at 1824). Should the defendant meet its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the defendant were not true reasons, but a pretext for discrimination. *Id.* at 501 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). The ultimate burden of proof remains on the plaintiff to show that the defendant intentionally discriminated. *Id.* At the summary judgment stage, "the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race or

disability discrimination." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993).

> A. **A Factual Dispute Exists As To Whether Defendant's Nondiscriminatory Reason for Eliminating Cook's Position is Pretext as There Are Inconsistencies in Whether the Stores in Cook's Territory Were Actually Decreased, No Other Sole Tech Positions Were Eliminated, Cook Was the Most Senior Sole Tech, Cook Had Proven Himself in Sales, His Position Was Terminated Approximately a Month After Returning Full-Time, Stores Closest to His Territory Were Given To Other Sole Techs, and A New Sole Tech Was Hired Shortly Before His Termination, With No Offer of This Position to Cook**

Plaintiff alleges and defendants have conceded for the purposes of this motion that Mr. Cook was a qualified individual with a disability as defined under the ADA. Therefore, the remaining issue is whether Defendant's nondiscriminatory reason for Mr. Cook's termination was pretext for illegal discrimination. It is true that when Mr. Cook was hired, he disclosed the fact that he had rheumatoid arthritis. However, at the time he was hired in August of 2001, he had not had a flare-up until late December of 2004. He was diagnosed with Still's Disease in early 2005. It was not until that time that his disability had an effect on his work performance, and it was not until that time that his disability caused him to be hospitalized and miss work. Even through Mr. Cook's hospitalization and part-time work schedule, he continued to meet all of his sales goals, and in fact was the number one Sole Tech as far as percentage gain in his territory.

According to Sheridan, the decision was made to terminate the Pittsburgh territory in the start of 2005. However, there was a sales meeting in Seattle after that time period, about a month prior to Mr. Cook's termination, during which there was a discussion of expanding the Sole Tech program from 150 Sole Tech stores to 300 Sole Tech stores. Furthermore, during the time Mr. Cook was either hospitalized or out on medical leave, new stores were added in Ohio.

These stores were closer from a mileage standpoint to the Pittsburgh territory than to the Cincinnati territory. Mr. Cook requested that these stores be assigned to him, but this request was denied. During one of Mr. Cook's hospitalizations, Hillebrand, the Florida Sole Tech, was transferred to a different position in Baltimore. Mr. Cook was not offered this job, nor was he even aware there was an opening. Significantly, Mr. Cook was also not offered the Sole Tech position in Florida that was available as a result of Hillebrand's transfer. A new Sole Tech, Carson Caprera was hired for the Florida position while Mr. Cook was hospitalized. This is despite the fact that Mr. Cook had previously requested a transfer to Florida, he had more experience as a Sole Tech (and in fact, was the most senior Sole Tech), and had proven himself in sales. Subsequent to this and again during the time period Mr. Cook was on medical leave, stores were added around the Buffalo area. Mr. Cook again requested that these stores be added to the Pittsburgh territory, however, they were given to Hillebrand instead. The reason given to Mr. Cook in denying these additional stores was that he should worry about the Pittsburgh territory. Mr. Cook testified that he was worrying about the Pittsburgh territory by requesting these stores, in that he was trying to expand the number of stores in the Pittsburgh territory. Defendant can hardly contend that it was necessary to eliminate the Pittsburgh territory and therefore Mr. Cook's job because of the lack of number of stores when Defendant purposely kept the Pittsburgh territory from expansion. Defendant intentionally structured the Pittsburgh territory for failure when it passed out stores closest to the Pittsburgh territory to other territories, in order to justify Mr. Cook's termination.

Furthermore, it is disputed that the number of stores in the Pittsburgh territory did actually decrease after Mr. Cook's termination. Scott Waltner, the Sole Tech responsible for the Pittsburgh stores after Mr. Cook's termination, testified that the number of stores in the

Pittsburgh area did *not* decrease after Mr. Cook's termination. The number of stores in the Pittsburgh area carrying the Brooks product remained the same after Mr. Cook's termination as it had been prior to his termination. Waltner testified that the sales numbers were also down in the Cincinnati area, however, his position was not eliminated. In fact, no other Sole Tech positions were eliminated. Both Waltner and Fendel testified that they were "shocked" when they heard about Mr. Cook's termination. They testified that Mr. Cook's sales were gaining just prior to his termination, and there had been no indication that this downsizing would occur. Fendel testified that he did not understand why one of the new Sole Techs, such as recently hired Carson Caprera, was not moved out of the Florida territory so it could be given to Mr. Cook.

Defendant made a concerted effort to push Mr. Cook out of his position, due to his disability. The business reason given by Defendant is simply pretext for discrimination. Mr. Cook was the most senior Sole Tech, his sales were strong, he was meeting all of his goals and in fact, sales in the Pittsburgh territory were better than the Cincinnati and Florida territories. Yet, Defendant refused to add new stores to the Pittsburgh territory even though it was the closest territory. Even assuming that the stores in the Pittsburgh territory did decrease after Mr. Cook's termination, the timing of Defendant's actions show it was attempting to get rid of Mr. Cook after his hospitalizations. Brooks knew of the alleged decrease in the Pittsburgh territory in early 2005. Mr. Cook was not told until June 2005. During the months in between, Brooks transferred Hillebrand, a less experienced, less senior Sole Tech, to another position. It hired Caprera, a new individual with obviously less experience as a Sole Tech, for the Florida territory. This position was not offered to Mr. Cook even though he had previously requested it and, according to Defendant, at that time knew of the alleged decrease of the Pittsburgh territory. A

month after Mr. Cook returned to work full-time, his position was terminated. He was not offered any other positions, and no other Sole Tech positions were eliminated.

  **B.  To the Extent That Defendant Alleges Cook Failed to Mitigate His Damages, A Factual Dispute Exists As To Whether Cook Properly Mitigated His Damages**

Defendant emphasizes the "job openings" relayed to Mr. Cook by Brooks employees after his termination. Specifically, Mr. Cook's direct supervisor, Marc Misiewicz reviewed his resume after Mr. Cook's termination and according to Defendant, "sent Cook suggestions to assist in his job search" in addition to communicating to Mr. Cook "that he would do what he could to help Cook find a position within the Russell Corporation brand". Misiewicz did review Mr. Cook's resume and suggested certain revisions. He did not, however, send Mr. Cook suggestions to assist in his job search, as indicated by Defendant. Additionally, Mr. Cook never heard from Misiewicz regarding any positions within the Russell Corporation after the initial passing mention.

John Fendel was not Mr. Cook's supervisor, as indicated by Defendant in its Brief. Fendel was the manager of the Brand Warriors, which was in the marketing department. Fendel mentioned the Brand Warrior position in Boston to Mr. Cook, but did not, as Defendant states, suggest he pursue the position. Fendel actually told Mr. Cook that taking the position would be a step in the wrong direction for him, discouraged Mr. Cook from taking the position, and told him he would have to go through the interview process. Furthermore, Mr. Cook did not think he was physically able to perform the Brand Warrior job, as he was under the impression that the Brand Warriors went running with the store owners. As for the apparel position, again, Fendel did not suggest Mr. Cook pursue the position as indicated by Defendant. In fact, Fendel had only seen that the position was open and knew no details of the position. The emails sent by Fendel to Mr.

Cook regarding job opportunities with other companies were simply "industry emails" he had received, cut and pasted, and forwarded to Mr. Cook months after his termination. Fendel testified that he did not really even look at the positions he forwarded to Mr. Cook.

Defendant's assertion that Mr. Cook failed to mitigate his damages is simply untrue. Defendant attempts to equate Mr. Cook's inability to recall specifically what jobs he applied for with Mr. Cook not applying for any jobs. Mr. Cook testified that he applied for numerous positions after his termination from Brooks in June of 2005. Mr. Cook was finally able to obtain employment at Finish Line in October of 2005, however it was only part-time. His schedule conflicted with his wife's work schedule, which created childcare issues. He quit his job with Finish Line in January of 2006 to care for his children, as at that time his wife was earning more income from her full-time position. Mr. Cook testified that subsequent to that, he again applied for various positions, but could not recall specifically what positions. Mr. Cook's inability to find gainful employment despite searching and applying for jobs is hardly the same as not attempting to find employment.

### C. The Same-Actor Inference Does Not Apply

Defendant argues that because accommodations were provided to Mr. Cook during his illness and his supervisors (along with many other employees) donated their paid time off, this confirms that there was no discrimination against Mr. Cook. The cases cited by Defendant in support of this are completely irrelevant and factually distinctive from this case.[1] Basically, these cases state that when the same actor who treats the plaintiff negatively had treated the plaintiff positively a short time before, there is an inference that there is no discriminatory

---

[1] Defendant, in conclusion to its argument, attempts to use partial answers provided by Mr. Cook in his Answers to Interrogatories in support of its argument. Defendant, however, incorrectly quotes the Answers given by Plaintiff, by failing to note that Plaintiff objected to both Nos. 14 and 16 of Defendant's Interrogatories as "vague and overbroad."

9

motive. *See*, i.e., *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172 (2001); *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173 (8th Cir. 1992); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267 (1996); *Coghlan v. American Seafoods Company, LLC*, 413 F.3d 1090 (9th Cir. 2005). However, as noted below, these cases are so factually distinctive from the case at hand that the inference does not apply to this case.

Two cases cited by Defendant, namely *Hill* and *Lowe*, are ADEA cases. In both cases, the older plaintiff (53 and 51 years old, respectively), was hired by the same-actor who fired the plaintiffs a short time later (less than a year and two years, respectively). *Hill*, 144 Wn.2d at 176, 190; *Lowe*, 963 F.2d at 174. The court in *Lowe* stated that a presumption of no discrimination was created as it was "simply incredible…that the company officials who hired [the plaintiff]…had suddenly developed an aversion to older people less than two years later." *Lowe*, 963 F.2d at 175; see also *Hill*, 144 Wn.2d at 190 (reaching the same conclusion with similar reasoning); see also *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003).

The next cases cited by Defendant are similarly irrelevant. *Coghland v. American Seafoods Company, LLC*, 413 F.3d 1090 (9th Cir. 2005) involved two Americans who were removed from their positions and replaced with Norwegian-born persons. The court held that as the same person had transferred the plaintiff to a better position less than a year before his termination, knowing he was an American, then the same actor inference applied. *Id.* at 1100. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267 (9th Cir. 1996), also cited by Defendant, involved a female plaintiff alleging gender discrimination resulting in her termination. The court found it irrational that the same person who hired a female would fire her less than a year later because of her gender. *Id.* at 270.

The facts of the above cases are obviously not relevant here. In the above, at the time of hiring the defendants knew of plaintiff's characteristic that they allegedly later discriminated against, i.e., age, nationality or gender. Although Defendant knew Mr. Cook had rheumatoid arthritis at the time he was hired, he had not yet been diagnosed with Still's Disease and had not had a flare-up in over five years. He was not hospitalized due to his disability until almost three and a half years after he began working at Brooks. At the time Mr. Cook was hired, neither he nor the Defendant knew that his disability would cause him to be hospitalized and absent from work. This obviously changed. Defendant also claims that its accommodation of Mr. Cook during the time of his illness constitutes positive conduct that requires the same-actor inference. Mr. Cook is not claiming that Defendant did not accommodate him, nor denying that most of his co-workers donated their sick time to him. Mr. Cook's contention is that Defendant's decision to eliminate his position was improperly motivated by Mr. Cook's disability and corresponding limitations and absences.

Defendant fails to address its negative conduct in intentionally structuring the new stores so as to ensure the Pittsburgh area would fail, and therefore provide justification for terminating Mr. Cook. Defendant fails to address its negative conduct in transferring a less senior, less experienced employee to Baltimore while Mr. Cook was on medical leave without offering said position to Mr. Cook. Defendant fails to address its negative conduct in hiring a new employee as a Sole Tech in Florida while Mr. Cook was on medical leave, without offering the position to Mr. Cook, all the while knowing Mr. Cook's position would be eliminated.

### IV. CONCLUSION

Taken individually, the actions of Defendant do not seem to indicate discrimination. However, in looking at all of the circumstances surrounding Mr. Cook's termination together, it

is clear that Defendant's nondiscriminatory reason for Mr. Cook's termination is pretext and he was terminated because of his disability. For the foregoing reasons, the Plaintiff respectfully requests that this Court deny the Defendant's Motion for Summary Judgment in its entirely because, when the evidence mentioned herein is viewed in the light most favorable to the Plaintiff, genuine issues of material fact exist as to whether the Defendant's nondiscriminatory reasons for Plaintiff's termination were pretext for illegal discrimination.

    Respectfully submitted,

    ROBERT PEIRCE & ASSOCIATES, INC.

    /s/ Gregory G. Paul
    GREGORY G. PAUL, ESQUIRE
    PA ID Number: 83334
    2500 Gulf Tower
    707 Grant Street
    Pittsburgh, PA 15219
    (412) 281-7229
    (412) 281-4229 (facsimile)
    gpaul@peircelaw.com
    Attorney for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment has been served via the Court's E-Filing System to the following counsel of record:

Jennifer C. Berry, Esquire
DORSEY & WHITNEY, LLP
U.S. Bank Centre
1420 Fifth Avenue
Suite 3400
Seattle, WA 98101-4010

this 18th day of June, 2008.

/s/ Gregory G. Paul
GREGORY G. PAUL, ESQUIRE
Attorney for Plaintiff