IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BILL E. COOK,                )
                             )
     Plaintiff,              )
                             )
          v.                 )     Civil Action No. 07-172 Erie
                             )
BROOKS SPORTS, INC.,         )     Judge Sean J. McLaughlin
                             )
                             )
     Defendant.              )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

This matter is before the Court upon Defendant's motion for summary judgment.

**I. BACKGROUND**

Plaintiff, Bill E. Cook ("Cook" or "Plaintiff"), is an adult individual residing in Erie, PA. (Complaint ¶4). In August, 2001, Cook began working for Defendant, Brooks Sports, Inc., a company that designs and markets running shoes, athletic apparel and accessories. (Complaint ¶5). Cook worked as a "Sole Tech," meaning that he acted as a sales liaison between Brooks and Finish Line, Inc., an athletic retailer specializing in name brand footwear and athletic apparel. (Deposition of Bill E. Cook (hereinafter, "Cook Dep."), p. 77). The Sole Tech program was new at that time and Cook played a significant role in determining its development and direction. (Id.)

At the time of his initial interview, Cook disclosed to Brooks that he suffered from rheumatoid arthritis, a disease that he had been diagnosed with at the age of 7. (Cook Dep., pp. 66, 71, 73). Prior to his interview, his last significant flareup from his arthritic condition occurred in approximately 1993-94. (Cook Dep., p. 96). The position did not require Cook to be an active runner, and Cook did not actively run as a hobby while employed by Brooks. (Cook Dep., p. 68-69).

As a Sole Tech, Cook traveled to Finish Line stores to meet with and train Finish Line salespersons, help sell Brooks products to customers in those stores, and offer informational clinics

concerning Brooks products. (Cook Dep., p. 77). Cook began working as a Sole Tech in Brooks' Cincinnati market, but requested and received a transfer to the new Pittsburgh market in 2002. Cook testified that he requested the transfer because he wanted to conquer new territory and build the new market to further his career. (Cook Dep., pp. 14, 47-48). In addition to opening the Pittsburgh territory, Brooks also expanded its markets to include the Carolinas and Florida around this time.

In late December, 2004, Cook suffered a significant flare-up of his arthritic condition that required him to be hospitalized on three occasions between December, 2004 and March, 2005. (Cook Dep., pp 100-101). As a result of his relapse, Cook worked part-time for several months and "redesigned" his job in many ways to accommodate his illness. (Cook Dep., pp. 103-04). These modifications included working a reduced schedule of four hours per day, communicating with his stores by email or phone rather than in person, and relying upon an assistant to perform the physical tasks involved in the job, such as taking inventory. (Cook Dep., pp. 102-04, 108-09). In early 2005, Cook was diagnosed with Still's Disease, a severe form of rheumatoid arthritis. (Cook Dep., pp. 89-90).

Throughout his tenure with Brooks, Cook was considered a good performer by management. Despite servicing a smaller market, the sales generated in the Pittsburgh area exceeded that of some other regions. (Cook Dep., pp. 60, 87-88). His performance review of April 15, 2005, reflected that Cook met Brooks' expectations even during the period of his illness. (Brooks' Concise Statement of Material Facts, Droke Declaration, Exhibit F).

In early 2005, Finish Line notified Brooks that it intended to scale back its partnership with it. Specifically, Brooks was informed that Finish Line intended to reduce the number of "doors"[1] where the Brooks product was stored from approximately 120 to 50 stores. (Sheridan Dep., pp. 12-13). Shortly thereafter, a decision was made by Brooks to reduce its Sole Techs by one and eliminate Cook's position.

Don Sheridan, who at various times held the positions of Marketing Manager, Team Sales Manager, National Sales Manager, and Director of National Accounts during the period of Cook's employment, testified as follows concerning the reasons for terminating Cook:

    Q:    Can you tell me why Mr. Cook's position was terminated?

---

[1]     "Doors" is synonymous with stores in the parlance of the retail industry.

2

A: The reason that Bill's territory was terminated was we had a shift in our national account business at Finish Line, one of our national accounts.
Q: When you say, "shift," what does that mean?
A: Our revenue and our doors, number of doors being covered, was being decreased.
Q: Who decided that decrease?
A: The Finish Line.
Q: How did you become aware of this decrease in revenue and doors?
A: They – in a meeting they let me know.
	*	*	*	*	*	*	*	**
Q: Do you recall when this occurred, the meeting?
A: Sometime at the end of – sorry, the start of 2005.
Q: Do you recall what was said to you?
A: I don't.
Q: Who made the decision to eliminate the sole tech position in Pittsburgh?
A: It was a group decision between myself and David Bohan of Brooks Sports.
Q: David Bohan?
A: Uh-huh.
Q: Can you spell that for me?
A: B-O-H-A-N. Just to be clarify that, I made the decision to eliminate it, but there was a conversation to bounce ideas and goals off of each other.
Q: Okay. And why did you decide that was the appropriate decision to make?
A: I think there were probably two reasons; one was our revenue was going to be decreased from somewhere around one and a half million dollars – that's the decrease we were going to take – and the number of doors that our product was going to be in was going to be decreased roughly from 120 doors to 50 or 60 doors, is how I remember it.

Q: And when you say, "doors" --
A: Physical Finish Line locations.
Q: And that was solely in the Pittsburgh area, these decreases?
A: It was across all five territories.
Q: Okay. Do you recall specifically in the Pittsburgh area what the decrease was?
A: Not specifically. I know it was – as a percentage basis, it was substantial.
Q: Can you compare the decrease in Pittsburgh to the decrease in the other territories?
A: Not – I couldn't off the top of my head, no.
Q: Was there a significant decrease in other territories around the same time?
A: What's classifies "significant," I guess?
Q: I guess what you would consider significant, as in you would need to change the business plan for that area.
A: No.
Q: So, no, it wasn't significant in other areas also?

3

> A: No, it wasn't significant enough to change other territories.
> Q: Do you know when you came to the decision to eliminate the Pittsburgh position?
> A: Not specifically. I know it had to have been in May of '05, maybe the end of May 2005.
> Q: Do you remember when Mr. Cook was told the position was going to be eliminated?
> A: Yes.
> Q: What date was that?
> A: I don't remember the date; I remember the day.
> Q: How was he told?
> A: In person.
> Q: And what was the reason given to him?
> A: That the territory was having a decrease both in revenue and number of doors covered.
> Q: Did it have anything to do with his specific job performance?
> A: No.
> Q: Had he been meeting all the sales goals established for him?
> A: Yes.

(Sheridan Dep., pp. 11-14).

Mark Misiewicz, who is currently the Key Accounts Sales Manager at Brooks, explained the reason for eliminating Cook's position as follows:

> Q: Can you tell me why there were no other positions eliminated if a decrease also occurred in other markets?
> A: Yeah. The decrease – what happened is we – when you look at total doors from Finish Line, and then we also took a look at what other doors we expanded to, because of the shrinking number of doors that Finish Line was giving us, the program then started to reach out to other accounts, Dick's Sporting Goods in the Pittsburgh market, for instance, Hibitz in the south, Retail Concepts down in the south. We were greatly affected in the Pittsburgh market, whereas in the other markets, we were able to pick up the store base difference in some cases and Dick's Sporting Goods or Academy or Sports Concepts, other accounts, made p the difference in some cases.
> And, like I said, the dollars generated within the Pittsburgh market, total dollars, was to the tune of 1.2 to $1.5 million, and to what extent – I can't remember what came out of Pittsburgh, but that was the market that was greatly affected from a revenue standpoint.
> Q: So you're saying that other stores could replace the Finish Line store in other markets?
> A: Yeah, in some cases where if we dropped three Finish Line stores, for instance, we were able to make the difference up, or at least carry the difference, with, say, Dick's Sporting Goods, Academy, or Retail Concepts, other accounts, whereas in Pittsburgh, that wasn't the case so much.

4

(Misiewicz Dep., pp. 18-19).

On June 23, 2005, Cook was notified of his termination by Sheridan. At deposition, Cook relayed the substance of his conversation with Sheridan and explained why he believed that his discharge was discriminatory:

> Q: So you were told that the company was restructuring the sole-tech program?
> A: Right.
> Q: Due to changes that were happening with the Finish Line account; right?
> A: Correct.
> Q: And that they had decided to eliminate the position here in Pittsburgh?
> A: Correct.
> Q: Or that region. That would be one that would be served by a local sole-tech person?
> A: Right.
> Q: Do you have any reason to think that was not a truthful statement?
> A: I don't know. I know that Finish Line continued to have Brooks product in most of all my stores and a few more.
> Q: Do you have any reason to think that the elimination of this region was caused by your medical condition?
> A: You would have to think that it possibly could.
> Q: In what way?
> A: Well, out of five markets, the guy that gets sick is doing better than two of those guys in those markets, and that guy loses his job when he was the first sole-tech. That's what I would assume.

(Cook Dep., pp. 130-31).

On July 10, 2007, Cook commenced the present action claiming that he was discharged because of his disability in violation of the Americans with Disabilities Act of 1990 ("ADA") See 42 U.S.C. §12112. A motion for summary judgment and response have been filed. This matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(c). In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party. Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita, 475 U.S. at 587).

### III. DISCUSSION

To establish a prima facie case of intentional discrimination under the ADA, Cook must show that he is: (1) a disabled person within the meaning of the ADA; (2) otherwise qualified to perform the essential functions of the job, with or without reasonable accomodation; and (3) has suffered an adverse employment action because of that disability. Turner v. Hershey Chocolate U.S., 440 F.3d 604 (3rd Cir. 2006). Under the McDonnell-Douglas burden-shifting framework, if Cook succeeds in establishing a prima facie case of discrimination, the burden shifts to Brooks to articulate a legitimate, nondiscriminatory reason for the termination. Shaner v. Synthes, 204 F.2d 494, 500 (3rd Cir. 2000). Once Brooks articulates a legitimate, nondiscriminatory reason, Cook must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but a pretext for discrimination. Id. at 501. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated remains, at all times, with Cook. Id. At the summary judgment stage, "the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional . . . disability discrimination." Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

Brooks concedes that Cook has made out a *prima facia* case. It contends, however, that Cook has failed to raise a triable issue of fact on the issue of pretext. Essentially, Brooks contends that

6

the decision to eliminate the Pittsburgh position represents a legitimate exercise of its business judgment which this Court should not properly second guess. Indeed, all things being equal, it is true that courts are appropriately reluctant to second guess a legitimate business judgment in the context of a pretext analysis in an employment discrimination case. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3rd Cir. 1998) ("Whether sales quotas or evaluation scores are a more appropriate measure of a manager's performance is not for the court (or factfinder) to decide."); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3rd Cir. 1997) ("The question is not whether the employer made the best or even a sound business decision; it is whether the real reason was discrimination."); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1216 (3rd Cir. 1988) ("[O]ur inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee.").

In Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994), the Third Circuit articulated the standard for establishing pretext. "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d at 764 (emphasis in original). A plaintiff must put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." Id. (emphasis in original). The focus is not on whether the "employer's decision was wrong or mistaken," but rather "whether discriminatory animus motivated the employer." Id. at 765.

After a careful review of the record, I find that a triable issue of fact as to pretext has been raised under the Fuentes standard. Drawing all reasonable inferences in favor of the plaintiff as I must, the record reflects that just shortly before his termination, Cook experienced a significant and debilitating aggravation of his arthritic condition. Cook returned to work full-time in May, 2005, and was discharged on July 1, 2005. The temporal proximity between the flare-up and the discharge is circumstantially supportive of Plaintiff's pretext argument. More fundamentally, however, the record reflects that apparently contrary to the proffered reason for the discharge (i.e., the elimination of Finish Line stores carrying Brooks product and the fact that, as a percentage, the Pittsburgh market

7

had a higher number of Finish Line accounts), Brooks product continued to be sold in all of the Pittsburgh stores after Cook's departure.

Scott Waltner, one of the Sole Techs who was retained and serviced the Pittsburgh region on a more abbreviated basis after Cook's departure, testified that the "number of stores carrying Brooks product in Pittsburgh" did not change. (Waltner Dep., p. 14). Cook testified to the same effect. (Cook Dep., p. 130).

I also note that Mr. Misiewicz testified that it was Brooks intention to "reach out to the other accounts" such as "Dick's Sporting Goods in the Pittsburgh market." (Misiewicz Dep., p. 18). The record reflects that Cook was servicing four Dick's Sporting Goods in the Pittsburgh area at the time of his termination. (Cook Dep., p. 106).

At oral argument, counsel for Brooks was questioned concerning the fact that the number of Finish Line stores carrying Brooks product in the Pittsburgh region did not drop:

> Mr. Droke: Okay. So, again, there's kind of two questions, and it's important to analyze them differently factually. First of all, are they selling a Brooks show in a particular store.
> The Court: All right.
> Mr. Droke: Prior to the decision that was made, there were about 170 stores where both of these were true and where they wanted to have an employee like Mr. Cook come in and regularly teach their employees.
> The Court: And prior to their decision to change the relationship with you, they not only wanted your shoes there, but they wanted a shoe specialist to occasionally visit and push the product. Is that right?
> Mr. Droke: That's right.
> The Court: Go ahead.
> Mr. Droke: And so two things happened. In some markets, there were some stores where Finish Line decided to stop selling the shoe altogether and pull it off of their shelf as one of their offerings. In some stores they decided to maintain one or two of the brands on the shelf, but – and this was similar to Pittsburgh – you know, have them be serviced by somebody just from afar; phone calls, faxes, and the like. And in some cases they still had enough sales volume, Finish Line did, that they wanted to have an employee from Brooks come in and actively train their employees and occasionally sell – they would have special fittings from Brooks and that type of thing, where they'd bring in some of their higher-end customers.
> The Court: All right. So in Pittsburgh, after Mr. Cook left, did the total number of stores where your product is sold,

8

| | including both Finish and non-Finish stores, decrease? |
|---|---|
| Mr. Droke: | As I understand the record, it remained reasonably constant as far as the total number of what they call doors that were selling one or more brands – one or more lines of the Brooks brand. |

(Oral Hearing Transcript, September 12, 2008, p. 11-12). There is nothing of *record*, however, reflecting a diminution in Brooks' product in the Finish Line stores in the Pittsburgh market or, for that matter, a direction from Finish Line that the quantity of product in their Pittsburgh stores be reduced. Once again, I note that the record reflects that despite a smaller geographic market, the Pittsburgh market outperformed, on occasion, the larger markets where Brooks product was sold.

Brooks argues that its favorable treatment of Cook during his convalescence from his flare-up coupled with the fact that he was hired with knowledge of his rheumatoid arthritic condition derails Cook's attempt to establish pretext. See Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 189-90 (2001) ("[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.") (citing Lowe v. J.B. Hunt Transp., Inc., 963 F.2d 173, 175 (8th Cir. 1992)). I disagree. Brooks' apparent willingness to accommodate Cook during his convalescence is a factor for the jury to consider in weighing competing evidence in favor of or against a finding of pretext. The record also establishes that at the time Cook was hired, he had not experienced a flare-up for several years. Thus, while Brooks was aware that he had rheumatoid arthritis, it had no reason to know that Cook suffered from Still's Disease which could produce and in fact did produce the severe problems he experienced in early 2005. The cases upon which Brooks relies for the same actor inference, therefore, are inapposite. In each of those cases, the decision makers hired the plaintiff with full knowledge of the particular trait which allegedly formed the basis for the discriminatory action. Here, as discussed above, Brooks management was not on notice of the potentially debilitating nature of Cook's arthritic condition when he was hired.

Finally, Brooks argues that Cook failed to properly mitigate any potential damages by seeking alternate employment following his termination. However, Cook's alleged failure to mitigate would not warrant summary judgment. Rather, it would be a factor if proven for the jury to consider in determining whether to issue damages and in what amount. See, e.g., Stager v. Beverly Health and Rehabilitation Services, 2008 WL 3165837, *21 (W.D. Pa. 2008). Accordingly, I express no opinion

as to the merits of Brooks' failure to mitigate defense at this time. Brooks remains free to argue that Cook's failure to mitigate limits the availability of damages at a later stage.

### IV. Conclusion

For the reasons set forth above, Brooks' motion for summary judgment is denied.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BILL E. COOK, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 07-172 Erie |
| BROOKS SPORTS, INC., | ) | Judge Sean J. McLaughlin |
| Defendant. | ) | |

## **ORDER**

AND NOW, this 11th day of February, 2009, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for Summary Judgment of Defendant Brooks Sports, Inc. is DENIED.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___